## STATE Ex Rel. *v.* LA FOLLETTE.

(196 Pac. 412.)

**Injunction—Appeal from Judgment Declaring Guilty of Contempt in Disobeying Unappealable Order.**

1. One declared guilty of contempt for disobedience of a temporary mandatory injunction can appeal from the judgment under Section 684, Or. L., and such an appeal in the contempt proceeding brings up for consideration the question of the validity of the temporary injunction, even if the order for the injunction be nonappealable.

**Contempt—Courts have Power to Enforce Orders Whether Wisely or Inconsiderately Made.**

2. Courts have power to enforce observance of their orders by employing contempt proceedings, and the power is not dependent upon whether an order has been wisely or inconsiderately made, and if a court has power to make a given order it also has power to compel obedience to that order until such time as the order is vacated, since a party has his remedy by appeal and cannot attack the order in a collateral proceeding for mere irregularity.

**Contempt—One Disobeying Void Order not Subject to Punishment for Contempt.**

3. If an order is void because made without jurisdiction, a party disobeying it is not guilty of contempt of court.

**Injunction — Order for Temporary Injunction Void in Absence of Undertaking — Disobedience of Temporary Injunction Issued Without Undertaking not Contempt.**

4. In an action against fruit-growers for specific performance of a contract to deliver loganberries for ten years at a minimum price of four cents per pound, where defendants claimed that they were

---

4. For authorities passing on the question of disobedience of void order as contempt, see notes in 1 Ann. Cas. 121; 16 L. R. A. (N. S.) 1063.

entitled to nine cents a pound for the year and plaintiff claimed they were entitled to only five and one-half cents a pound, an order for a temporary injunction against sale of the berries by defendants to other than plaintiff providing for payment of five and one-half cents to the defendants direct and three and one-half cents to the clerk of court to await the result of the trial, was absolutely void in the absence of an undertaking, under Section 417, Or. L., and disobedience thereof did not constitute contempt.

From Marion: GEORGE G. BINGHAM, Judge.

Department 1.

This proceeding was brought in the name of the state upon the relation of the Salem King's Products Company, a corporation, against J. W. La Follette for an alleged contempt of court. The Circuit Court held that La Follette was guilty of a contempt of court on account of having willfully disobeyed a preliminary injunction issued in a suit begun by the Salem King's Products Company against J. W. La Follette. There was a judgment sentencing La Follette to be punished by a fine of $100, and he appealed.

Under date of July 30, 1917, J. W. La Follette entered into a contract whereby he agreed to sell to the Salem King's Products Company, all the loganberries grown on 11 acres of land, owned by him, during the period of 10 years beginning with 1918 and ending with 1927. The contract fixed four cents per pound as the price to be paid for the loganberries; but attached to the contract and made a part of it was a rider reading as follows:

"If Salem King's Products Co. raises their buying price to other growers in 1918, or thereafter, this contract will automatically conform with that price."

The form of the contract is exactly like the contract exemplified in full in *Salem King's Products Co.* v. *Ramp,* post, p. 329 (196 Pac. 401).

La Follette delivered all or at least most of the crop raised by him in 1918. He refused, however, to deliver his 1919 crop. Before and at the beginning of the picking season of 1919 the market price of loganberries had advanced to nine cents. The Salem King's Products Company had in the spring of 1919 made certain contracts for berries at five cents per pound, and in addition the company had promised to pay a bonus of one half a cent per pound to growers with whom it had made term contracts.

A few days before La Follette began picking his 1919 crop, as well as upon prior occasions, he told officers of the company that he would not deliver any berries to the corporation unless paid the market price, because, as he claimed, he was entitled under the terms of the rider to receive the market price which exceeded four cents per pound. The officers of the company told La Follette that the company would pay only five and one-half cents for the 1919 crop because, as the company claimed, it was obliged to pay more than four cents only in the event it actually bought berries at an advanced price, and even then the advanced price actually paid by the company and not the market price constituted the measure of the price to be paid to La Follette; and since the company had actually contracted for berries at five cents and had agreed to pay a bonus of one half a cent the officers of the company told La Follette that the limit of the company's liability under the terms of the contract was five and one-half cents per pound. In short, the respective contentions of the litigants in the instant case are similar to the respective contentions of the parties in *Salem*

*King's Products Co.* v. *Ramp, post,* p. 329 (196 Pac. 401).

La Follette commenced picking on or about July 1, 1919. The crop amounted "to about 33 tons." La Follette had picked about 16½ tons of loganberries and had delivered all of them to the Equity Queen Canning Company when on July 10, 1919, the Salem King's Products Company began a suit to compel La Follette specifically to perform his contract by delivering the remainder of his loganberries to the Salem King's Products Company and also to compel him to account for the berries which he had delivered to the Equity Queen Canning Company. The complaint was filed on July 10th, and the summons was served on July 11th. Affidavits for and against a temporary injunction were filed on July 11th and 12th; and on July 12th the Circuit Court issued a temporary mandatory injunction commanding La Follette to deliver the remainder of his loganberry crop to the Salem King's Products Company and commanding the Salem King's Products Company to pay directly to La Follette five and one-half cents for every pound of berries delivered by him, and to pay to the clerk of the court an additional three and one-half cents per pound to be held by the clerk until the final determination of the suit. Resolved to its final analysis, the controversy between La Follette and the Salem King's Products Company was one concerning the price to be paid; for La Follette was willing to sell, provided he received the market price for his berries. La Follette demanded nine cents per pound, the market price; the company was willing to pay five and one-half cents; and hence the difference between five and one-half and nine cents, or three and one-half cents per pound, was the amount in dis-

pute. The court required the payment of three and one-half cents per pound to the clerk with a view of returning the money to the company in the event the court ultimately determined that the company was entitled to receive the berries at five and one-half cents, or of paying it to La Follette in the event the court finally decided that he was entitled to the market price. La Follette appealed, or at least attempted to appeal, from the order directing the issuance of the temporary injunction by serving and filing on July 15th a notice of appeal together with an undertaking on appeal.

On July 16, 1919, the Salem King's Products Company caused an affidavit to be filed pursuant to Section 673, Or. L., as a basis for a contempt proceeding against J. W. La Follette. The affidavit recited the fact that a suit had been begun by the Salem King's Products Company against La Follette for the purpose of compelling him specifically to perform his contract for the delivery of loganberries. The affidavit related the fact that a temporary mandatory injunction had been issued and also recited the terms of the injunction. The affidavit further stated that on July 12th, 14th, 15th, and 16th, La Follette had sold large quantities of berries to the Equity Queen Canning Company and had failed to make any deliveries to the Salem King's Products Company.

On July 17th La Follette first demurred to the affidavit and then answered by filing a general denial. On the same day, July 17th, there was a trial, which terminated in the judgment and sentence involved in this appeal.                          REVERSED.

For appellant there was a brief over the names of *Mr. John Bayne* and *Messrs. Smith & Shields,* with

oral arguments by *Mr. Bayne* and *Mr. Roy F. Shields.*

For respondent there was a brief over the names of *Mr. Prescott W. Cookingham* and *Mr. James G. Heltzel,* with an oral argument by *Mr. Cookingham.*

HARRIS, J.—1. It must be remembered that, so far as the record here discloses, up to the moment when La Follette was adjudged guilty of contempt and sentenced to pay a fine of $100, the suit in equity brought by the *Salem King's Products Co.* v. *La Follette* had proceeded no further than the filing of the complaint, service of summons and complaint on La Follette, and the issuance of the preliminary mandatory injunction. The issues between the parties had not yet been defined, for the time for answering the complaint in the suit had not yet expired; nor had La Follette yet filed an answer. The record does not tell us about the result of the suit in equity; nor, indeed, is the final outcome of that litigation material here. In the instant case we are concerned with nothing except the contempt proceeding. It must be remembered, too, that, regardless of whether or not the order granting a temporary mandatory injunction is an appealable order, La Follette has an unquestioned right to appeal from the judgment declaring him guilty of a contempt because Section 684, Or. L., expressly grants a right of appeal, and *State* v. *O'Day,* 41 Or. 495, 499 (69 Pac. 542), is a precedent for holding that the appeal from the judgment rendered in the contempt proceeding "brings up for consideration" the question of the validity of the temporary injunction, even though it be assumed or held that the order for the injunction

is a nonappealable order: See also: *State ex rel.* v. *Gray,* 42 Or. 261, 265 (70 Pac. 904, 71 Pac. 978).

2, 3. In the very nature of things courts must and do have power to enforce observance of their orders by employing contempt proceedings. The power to enforce obedience is not dependent upon whether an order has been wisely or inconsiderately made. If a court has power to make a given order, it also has power to compel obedience to that order until such time as the order is vacated. It is no defense against a contempt proceeding to say that the order which has been disobeyed was not justified by the facts, or was erroneously or improvidently made; because the party has his remedy by appeal and he cannot in a collateral proceeding attack the order for mere irregularities: *State ex rel.* v. *Downing,* 40 Or. 309, 321 (58 Pac. 863, 66 Pac. 917). If, however, an order is void because made without jurisdiction, then a party can question the validity of the order and can prevent punishment as for a contempt. An order which is absolutely void is only a seeming order and in truth is no order at all; and hence when a party refuses to obey a void order he has in reality not been guilty of refusing to obey an order of the court: 6 R. C. L. 505; *McHenry* v. *State,* 91 Miss. 562 (44 South. 831, 16 L. R. A. (N. S.) 1062); *Smith* v. *People,* 2 Colo. App. 99 (29 Pac. 924). Stated broadly, a party cannot be guilty of contempt of court for disobeying an order which the court had no authority of law to make: *State* v. *District Court,* 21 Mont. 155 (53 Pac. 272, 69 Am. St. Rep. 645). Of course, the Circuit Court has jurisdiction and therefore power to decide the suit in equity brought by the Salem King's Products Company against La Follette; and yet even though the court has general

jurisdiction over that suit in equity, La Follette cannot be held guilty of contempt if the temporary injunction disobeyed by him was made in the ancillary proceeding without jurisdiction, because if the order was made without jurisdiction it was absolutely void: *McHenry* v. *State,* 91 Miss. 562 (44 South. 831, 16 L. R. A. (N. S.) 1062); *Smith* v. *People,* 2 Colo. App. 99 (29 Pac. 924). The only question to be considered is whether the court had jurisdiction to order the injunction, and the question whether the court erred or the power was improvidently exercised is not involved; *Court Rose, F. of A.,* v. *Corna,* 279 Ill. 605 (117 N. E. 144).

4. The plaintiff did not furnish, nor did the Circuit Court require, an undertaking. The payment of three and one-half cents per pound to the clerk was designed as a substitute for an undertaking. The only question for decision is whether the failure to give an undertaking rendered the injunction void. In this state, as in most states, there is a statute requiring the plaintiff to furnish an undertaking before a preliminary injunction can be allowed. This legislation was enacted in order to remedy an evil. Issuance of temporary injunctions which were afterwards dissolved upon final hearing oftentimes caused damages to the enjoined party; and yet, no matter how serious the damages may have been, neither law nor equity furnished a remedy, because the damages were supposed to have been caused by the judgment and order of the court and not by the plaintiff, if he did nothing more than sue in good faith. The injustice which so often flowed from injunction orders, for the consequences of which the courts alone were responsible under the law, prompted legislatures to enact statutes requiring the giving of an undertaking

as a condition precedent for the allowance of a
temporary injunction: *State ex rel.* v. *Williams,* 221
Mo. 227 (120 S. W. 740).

Our statute, Section 417, Or. L., reads as follows:

"An injunction may be allowed by the court, or
judge thereof, at any time after the commencement
of the suit and before decree. Before allowing the
same, the court or judge shall require of the plain-
tiff an undertaking, with one or more sureties, to the
effect that he will pay all costs and disbursements
that may be decreed to the defendant, and such dam-
ages, not exceeding an amount therein specified, as
he may sustain by reason of the injunction if the
same be wrongful or without sufficient cause."

The language of the statute is imperative, for the
wording is "before allowing same, the court or judge
shall require of the plaintiff an undertaking":
*Henderson* v. *Tillamook Hotel Co.,* 76 Or. 379, 387
(148 Pac. 57, 149 Pac. 473). This statute in effect
declares that judges and courts are without jurisdic-
tion and therefore without power to allow temporary
injunctions unless an undertaking is first filed.

The relator suggests that the payment of money
into court is not only equivalent to but better than
an undertaking. The answer to this suggestion is
that the statute commands the giving of an under-
taking and makes no provision for the deposit of
money in lieu of an undertaking. If the legislature
had intended that a money deposit should be the
equivalent of an undertaking, it would have made
provision for the deposit of money just as it did in
the case of giving bail after an arrest. Moreover,
the payment of three and one-half cents per pound to
the clerk did not furnish the same security as an
undertaking. The undertaking required by statute
secures the defendant for his costs and disburse-

ments as well as for his damages. It is true that
the court fixes the amount of the undertaking and
that the court in the instant case did fix the amount
of money to be paid into court; but it is also true
that the amount paid into court was security only
for the berries themselves and there was no security
at all for the defendant's costs and disbursements.
If an undertaking had been filed it would have been
security for the whole amount of costs and disburse-
ments in addition to the security· for damages, re-
gardless of the amount fixed in the undertaking, as
the limitation of amount fixed in the undertaking
applies only to the amount of the damages: *Officer* v.
*Morrison,* 54 Or. 459 (102 Pac. 792).

The giving of an undertaking is indispensable.
The court could not dispense with that which the
legislature has declared to be indispensable: *Swope*
v. *Seattle,* 35 Wash. 69 (76 Pac. 517). Although the
court acquired jurisdiction over the suit, it did not
acquire jurisdiction to allow a preliminary injunc-
tion in the ancillary proceeding attempted to be
prosecuted by the plaintiff. The failure to give the
undertaking rendered the order for the injunction
absolutely void; and therefore La Follette cannot be
punished as for a contempt. Although there are a
few adjudications to the contrary, the overwhelming
weight of judicial opinion is in accord with our con-
clusion: *State* v. *Greene,* 48 Neb. 327 (67 N. W. 162);
*State ex rel.* v. *McQuillin,* 260 Mo. 164 (168 S. W.
924); *State ex rel.* v. *Williams,* 221 Mo. 227 (120
S. W. 740); *Castleman* v. *State,* 94 Miss. 609 (47
South. 647); *Baker* v. *Meisch,* 29 Neb. 227 (45 N. W.
685); *Ex parte Miller,* 129 Ala. 130 (30 South. 611, 87
Am. St. Rep. 49); *Baur* v. *Wilkes-Barre L. Co.,* 259
Pa. St. 117 (102 Atl. 430); *Boykin* v. *Patterson*

(Tex. Civ. App.), 214 S. W. 611; *Griffith* v. *State* (Tex. Civ. App.), 210 S. W. 293; *McHenry* v. *State,* 91 Miss. 562 (44 South. 831, 16 L. R. A. (N. S.) 1062); *Smith* v. *People,* 2 Colo. App. 99 (29 Pac. 924); *MacWatters* v. *Stockslager,* 29 Idaho, 803 (162 Pac. 671); *Diehl* v. *Friester,* 37 Ohio St. 473; *Lawton* v. *Richardson,* 115 Mich. 12 (72 N. W. 988). See, also: *Western Academy Beaux Arts* v. *De Bit,* 101 Wash. 42 (171 Pac. 1036); *Swope* v. *Seattle,* 35 Wash. 69 (76 Pac. 517); 1 Spelling on Injunctions (2 ed.), § 935; *Winslow* v. *Nayson,* 113 Mass. 411; *Conley* v. *Brewer* (W. Va.), 102 S. E. 607.

The judgment is reversed.                    REVERSED.

BURNETT, C. J., and JOHNS and McBRIDE, JJ., concur.